1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

9

# SOUTHERN DISTRICT OF CALIFORNIA

10
11

STEVECO, INC.,                                         CASE NO. 04CV0130 R(BLM)

12
                              Petitioner,              CORRECTED ORDER AFTER
                                                       BENCH TRIAL
        vs.

13
GAINSBOROUGH INTERNATIONAL,
14
INC.,

15
                              Respondent.

16
17
18          This case comes to the court in the context of an appeal of a decision of the Secretary

19   of Agriculture.    In the action before the Secretary, Steveco, Inc. ("Steveco") sued

20   Gainsborough International, Inc. ("Gainsborough") for failing to pay the amount it agreed to

21   pay Steveco for four shipments of grapes. Gainsborough counterclaimed, alleging it was

22   damaged because Steveco breached the warranty of suitable shipping condition. The Secretary

23   ruled in Gainsborough's favor and ordered Steveco to pay Gainsborough reparation. Steveco

24   subsequently filed a petition and complaint challenging the Secretary's decision, and

25   Gainsborough filed a counterclaim challenging the amount awarded.  The court held a bench

26   trial in this case.  For the reasons set forth below, the decision and final order of the Secretary

27   is affirmed.

28   / / /

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Steveco Has Failed to Demonstrate the Shipment Terms Were California Inspection Final**

The Secretary concluded, and Steveco does not dispute, that Steveco has the burden of proving that the shipping terms were California inspection final. <u>See</u> Secretary's Decision and Order at 12; Tr. at 10:4-12. The Secretary concluded that Steveco did not meet this burden. The findings of fact in the Secretary's decision are prima-facie evidence of the facts stated therein. <u>See</u> 7 U.S.C. § 499g(c). This means "that they shall stand as the established facts until sufficient evidence is produced on the trial to overcome them." <u>Spano v. Western Fruit Growers, Inc.</u>, 83 F.3d 150, 152 (10th Cir. 1936). The court concludes that the evidence presented at trial does not change the Secretary's factual conclusion that the parties did not agree that the shipping terms were California inspection final.

At trial, counsel presented the testimony of Mr. Anderholt and Mr. Gainsborough, who negotiated the parties' agreement. When asked by Steveco's counsel whether he and Mr. Gainsborough discussed whether or not the shipments were to be California inspection final or f.o.b., Mr. Anderson answered: "Well, yes. None of our export grapes were sold f.o.b. They were always sold California Inspection Final." Tr. 18:13-20. However, when Mr. Gainsborough was asked by his counsel whether there was any discussion between he and Mr. Anderholt regarding the terms of these shipments, Mr. Gainsborough testified that there was not. Tr. 217:12-21. Although based on Mr. Anderholt's entire testimony it is clear that Steveco *intended* that the shipping term be California inspection final, the court finds equivocal Mr. Anderholt's testimony regarding whether the parties actually discussed the shipping terms and chooses to believe Mr. Gainsborough's testimony that Mr. Anderson and Mr. Gainsborough did not discuss the shipping terms.

The parties were asked to brief the application of U.C.C. § 2207 to these facts. Cal.Comm. Code § 2207 provides in relevant part:

> (1) A definite and seasonable expression of acceptance or **a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon** unless acceptance is expressly made conditional on assent to the additional or different terms.

04CV130

(2) **The additional terms are to be construed as proposals for addition to the contract.  Between merchants such terms become part of the contract unless**:

(a) The offer expressly limits acceptance to the terms of the offer;

(b) **They materially alter it**; or

(c)  Notification of objection to them has already been given or is given within a reasonable times after notice of them is received.

(emphasis added).  The court concludes that application of § 2207 to the present facts does not alter the conclusion that Steveco has failed to demonstrate that the terms were California inspection final.  Before the Secretary, Steveco relied on the invoices it sent Gainsborough after the grapes were shipped, which invoices contained the California inspection final term. As the Secretary noted, Gainsborough "arguably had no reason to take notice of the terms stated on the invoices because it had already confirmed the sales terms as it understood them prior to receipt of the invoices, and well before the grapes had been shipped." Secretary's Decision and Order at 13.  Moreover, given the harshness of the California inspection final term, such an additional provision would certainly materially alter the parties' contract.[1]  Thus, regardless of Gainsborough's failure to object to this term, by operation of § 2207(2)(b) this term did not become part of the parties' contract.

.       Not only does application of § 2207 not support the conclusion that the shipping terms were California inspection final, but application of § 2207 supports Gainsborough's position that the terms were f.o.b. Delano.  It is undisputed that prior to the grapes being shipped, Gainsborough faxed Steveco sales memorandum that contained the additional term "f.o.b. Delano."  Because f.o.b. is the shipping term implied by courts in the absence of an agreement between the parties, see Ocean Breeze Export, Inc. v. Rialto Distributing, Inc., 60 Agric. Dec. 840 (2001); Hunts Point Tomato Co., Inc. v. S&K Farms, Inc., 42 Agric Dec. 1224 (1983), such a term cannot be said to materially alter the parties' agreement.  Accordingly, pursuant

---

[1]  "Examples of typical clauses which would normally 'materially alter' the contract and so result in surprise or hardship if incorporated without express awareness by the other party" include "a clause negating such standard warranties as that of merchantability or fitness for a particular purpose in circumstances in which either warranty normally attaches . . . ." Uniform Commercial Code Comment 4.

04CV130

1  to § 2207, this additional term became a part of the contract in light of Steveco's failure to

2  object within a reasonable time period.

3  **Steveco Breached the Warranty of Suitable Shipping Condition**

4  "In an f.o.b. sale, the buyer, upon acceptance of goods, is liable for the contract price,

5  less damages due to any breach of warranty or contract by the seller." Hunts Point Tomato

6  Co., Inc. v. S&K Farms, 42 Agric Dec. 1224, 1225 (1983); see also Secretary's Decision and

7  Order at 14. "The burden is on the buyer to prove the breach and damages by a preponderance

8  of the evidence." Id.; see also Borton & Sons, Inc. v. Firman Pinkerton Co., Inc., 51 Agric

9  Dec. 905, 910 (1992); Secretary's Decision and Order at 14..

10  Because the grapes were to be shipped "f.o.b. Delano," Steveco had the duty to place

11  the grapes free on board "in suitable shipping condition." See 7 C.F.R. § 46.43(i). "Suitable

12  shipping condition" means that "the commodity, at time of billing, is in a condition which, if

13  the shipment is handled under normal transportation service and conditions, will assure

14  delivery without abnormal deterioration at the contract destination agreed upon between the

15  parties." 7 C.F.R. § 46.43(j). In other words, Steveco "had a duty to load a product which,

16  given normal transportation, would hold up to its overseas destination, if known." O.P.

17  Murphy Produce Co., Inc. v. Kelvin S. Ng, 41 Agric. Dec. 772, 776 (1982).

18  After hearing all of the evidence at trial, the court concludes the Steveco did in fact

19  breach its warranty of suitable shipping condition. The Secretary found as a matter of fact that

20  the grapes suffered sulphur dioxide injury that was the result of the application of sulphur

21  dioxide (also known as SO2) to the grapes while they were in Steveco's possession, and the

22  evidence presented at trial was not sufficient to overcome this finding of fact. In fact, the

23  overwhelming evidence was that the grapes suffered from sulphur dioxide injury. Mark

24  Steinberg, who was hired by Steveco to survey the grapes in England once it received word

25  from Gainsborough that there was a problem with the grapes, testified that he observed the

26  grapes to have "high, very high" levels of sulfur dioxide injury in the form of bleaching. Tr.

27  183:1-184:6. Mr. Steinberg testified that he tasted the grapes and that the bleached berries

28  tasted bad and the unbleached berries tasted normal. Tr. 188:1-5. Dr. Sidney Seimer similarly

testified that the grapes at issue showed "a considerable amount of sulfur dioxide injury" that is "associated with SO2 levels." Tr. at 287:2-8. Also, Mr. Luvisi testified that an excess quantity of sulphur dioxide played a role in the grapes tasting bad upon their arrival in England. Tr. 250: 3-13; Tr. 251:14-16. Finally, Esmail Fallahi, one of Steveco's experts at trial, admitted that the grapes exhibited symptoms of sulphur dioxide injury. Tr.; at 105: 24-106:4.

The court notes that during the proceedings before the Secretary, an issue arose as to whether there was sufficient evidence as to the extent of the damage to the grapes to support a finding that Steveco breached the warranty of suitable shipping condition. Ultimately, the Secretary concluded that there was, explaining:

> In the instant case, we do not have specific percentages to apply to the sulfur dioxide injury found in the grapes. However, the surveyor did note that a significant and/or fairly extensive degree of defect was found in all of the cartons sampled. The USDA's Market Inspection Instructions handbook for grapes states, in relevant part, that "(o)ne of the best indications of injury from sulfur dioxide is a distinctly localized collapse or a bleaching of that part of the berries adjacent to the capstems, or berries that are cracked or wet and loose from the capstems." The handbook states further that, "(i)njury that causes . . . only slight bleaching but with the other effects apparent on white grapes, shall be scored as 'Sulfur Dioxide' injury'." From the description provided in the survey it is apparent that a significant portion [of] the grapes in all samples showed defects that were scorable as sulfur dioxide injury. Under the circumstances, and in consideration of the other defects noted on the surveys, including shattered berries ranging anywhere from 13 to 31%, we find that the descriptions provided by the surveyor were sufficiently quantitative for us to conclude with reasonable certainty that the four container loads of grapes exhibited abnormal deterioration upon arrival at the contract destination.

Secretary's Decision and Order at 15-16. The survey conclusions regarding the percentage of shattering[2] support a finding that the warranty of suitable shipping condition was breached. For example, in Jim Hronis & Sons v. Luna Co., Inc., 47 Agric. Dec. 1497, 1498-1499 (1988), the court concluded that it was "evident from the federal inspections of the two loads of grapes made shortly after arrival that the grapes did not make good delivery under the suitable

---

[2] Dr. Fallahi explained that shattering occurs when the berries separate form the stem. TR. 91:22-25.

04CV130

shipping condition warranty applicable in f.o.b. sales" where the grapes were found to be "firm and mostly firmly attached to cap stems" but where the shatter rate for one shipment was between 11 to 17% for most samples and where the shatter rate for the other shipment was between 11 to 20% – rates of shatter that are much less than the shatter rates in the present case.

In addition, the U.S.D.A. standard for total defects, including shatter, in U.S. fancy grade grapes is no more than eight percent., see Tr. 119:8-120:10; Tr. 257:20-25, and there can be no more than two percent serious defects and no more than one-half of one percent decay. See TR. 119:19-120:3. Although Steveco did not warrant that the grapes would grade as U.S. fancy upon their arrival in England, see Pacific Tomato Growers, Ltd., 60 Agric. Dec. 348 (2001), the U.S.D.A. standards are nonetheless a relevant starting point for determining whether the seller has made good delivery. Id. at n. 7. Considering the U.S.D.A. standard for U.S. fancy grapes and the percent of damage observed upon the grapes arrival, the court concludes that there was abnormal deterioration.

Moreover, at trial additional evidence was presented regarding the rate of sulphur dioxide injury. Specifically, Mr. Steinberg testified that he observed the grapes to have sulfur dioxide injury in the form of SO2 bleaching and that he estimated approximately 10 percent of the grapes suffered from such injury. TR. 184:2-10; TR. 185: 3-25; TR 186:9-12. At this rate, whether the sulphur dioxide injury is considered by itself or in conjunction with the shatter, the extent of sulphur dioxide injury observed is sufficient to demonstrate that the grapes experienced abnormal deterioration during transit.

Moreover, the weight of the evidence supports rather than contradicts the Secretary's finding that the sulphur dioxide injury to the grapes should be attributed to Steveco's repeated gassing of the grapes with sulphur dioxide during storage and immediately prior to shipment. On this issue, Gainsborough introduced into evidence a letter by Mr. Steinberg to Steveco regarding his survey of the grapes. In his February 22, 2001 letter, Mr. Steinberg opined that "the most likely cause of the SO2 bleaching noted in the grapes involved, was a result of multiple SO2 applications in the storage rooms prior to shipping. The bleaching was a result

1   of an accumulation of the gas over the two months of storage rather than from a one-time

2   application of a low rate of SO2 in the export container." Defendant's Exhibit U. Dr. Siemer

3   similarly testified that in his opinion the sulphur dioxide injury "was from more than a single

4   application of SO2." TR. at 287:9-10; see also 299:18-22 (testimony of Dr. Seimer that "the

5   SO2 bleaching was a work in progress" and a result of the various applications of sulphur

6   dioxide). Likewise, Mr. Luvisi explained that the more grapes are fumigated with sulphur

7   dioxide, the more sulfite residues will remain in the grapes and will eventually affect the

8   grapes' taste. Tr. 274:8-20.

9       Steveco has argued that the shipping conditions were the cause of the grapes'

10   deterioration. Where a party questions the normality of transportation services, "the buyer

11   who has accepted a commodity has the burden of proving that transportation service and

12   conditions were normal." Pacific Tomato Growers, Ltd. v. American Banana Co., Inc., 60

13   Agric. Dec. 348 (2001). The Secretary concluded that the temperatures during transit "were

14   within the normal range," a factual finding that Steveco failed to overcome at trial by a

15   preponderance of the evidence.

16       Moreover, the court notes that even if it were to conclude that the shipping conditions

17   were abnormal due to the temperature during shipment, Steveco may still be found to be in

18   breach if the nature of the damage found at destination is such that either (1) the damage could

19   not have been caused by the faulty transportation service, or (2) the damage, although

20   aggravated by the faulty transportation service, is such that "the commodity would clearly have

21   been abnormally deteriorated even if transit service had been normal." Id. The Secretary

22   concluded that while the elevated temperatures "may have advanced the manifestation of the

23   sulphur dioxide injury," it did not cause the injury. Secretary's Decision at 17. Steveco did

24   not present sufficient evidence at trial to overcome the presumption of the correctness of the

25   Secretary's factual finding that the temperatures did not cause the sulphur dioxide injury.

26       Moreover, the evidence at trial clearly supports by a preponderance of the evidence the

27   conclusion that, to the extent the temperature may have aggravated or advanced the sulphur

28   dioxide injury, such aggravation was slight, at best. Patrick Brecht presented general

testimony that the temperature in the containers affected the taste of the grapes because changes in temperature can influence the penetration of the sulphur dioxide into cut, bruised or shattered fruit.    Tr. 320:15-321:4.    However, Mr. Luvisi testified that the transit temperatures here had a minimal effect, if any, on the excess sulphur dioxide in the grapes, see Tr. 252: 1-9, and, in fact, Mr. Luvisi later testified that temperatures of 38 to 40 degrees would not increase the level of sulphur dioxide in the grapes and would have "no effect" on the sulphur dioxide injury exhibited by the grapes at issue here based on studies where grapes that were held at 39 degrees and fumigated weekly for six to eight weeks showed less sulphur dioxide bleaching than grapes held at 31 degrees.  Tr. 275:24-276:6; 279:2-13.  Dr. Seimer similarly testified that "the temperature had very little to do with the sulfurous acid flavor" of the grapes.  Tr. 289:5-14.    In light of all of the testimony regarding the transit temperatures and the nature and extent of the sulphur dioxide injury to the grapes at the time of the grapes arrival in England, the court, like the Secretary, concludes that the injury to the grapes is attributable to Steveco's gassing of the grapes and not to the transportation conditions.

**Damages**

The court has carefully reviewed the Secretary's original and amended decisions regarding damages. The court has also carefully considered the evidence presented at trial as well as counsel's arguments in light of the relevant case law.  Having done do, the court finds the law regarding damages to be as set forth in the Secretary's orders on reconsideration, and concludes that Steveco owes Gainsborough damages as set forth in the Secretary's orders on reconsideration.

**IT IS SO ORDERED.**

DATED:  April 6, 2007

John S. Rhoades, Judge
United States District Court